UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BONNIE J. WARD, | CASE NO. 5:12CV2722 |
| Plaintiff, | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | |
| CAROLYN W. COLVIN[1], ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

Bonnie Ward ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

**I.    PROCEDURAL AND FACTUAL HISTORY**

On March 25, 2009, Plaintiff applied for DIB and SSI, alleging disability beginning February 2, 2007. ECF Dkt. #12 ("Tr.") at 166-171.[2] Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013 ("DLI"). Tr. at 22. The SSA denied Plaintiff's DIB and SSI applications initially and on reconsideration. Tr. at 92-95. Plaintiff requested an administrative hearing, which was held on February 11, 2011. At the hearing, the ALJ accepted the testimony of Plaintiff, who was accompanied by a non-attorney representative, and Elena Kurtanich, a vocational expert ("V.E."). Tr. at 70-96. Following the hearing, the ALJ issued

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

vocational and psychiatric interrogatories. Plaintiff requested that a second hearing be conducted in order to challenge the responses to the interrogatories. A second hearing was conducted on July 25, 2011. Tr. at 44-69. At the hearing, a second ALJ accepted the testimony of Plaintiff and a second V.E., George Starosta. Plaintiff was represented by counsel at the second hearing. On August 3, 2011, the ALJ issued a Decision denying benefits. Tr. at 25-37. Plaintiff filed a request for review, which the Appeals Council denied on September 25, 2012. Tr. at 1.

On October 30, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On March 9, 2013, Plaintiff filed a brief on the merits. ECF Dkt. #16. On April 4, 2013, Defendant filed a brief on the merits. ECF Dkt. #17. A reply brief was filed on April 9, 2013. ECF Dkt. #18.

## II. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was fifty-four years of age on the alleged onset date and fifty-eight years of age at the hearing, suffered from bipolar disorder, borderline personality disorder, and low back strain, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 22. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525, 404.1526, §416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 23-24.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. §404.1567(c), except that she is limited to occupations that require simple instructions and simple and routine tasks in a low stress environment, without frequent changes in the work settings or processes, and that do not involve higher than average production standards. The ALJ further found that Plaintiff is limited to occupations that involve no more than occasional, superficial contact with members of the public, and coworkers. Tr. at 24.

The ALJ ultimately concluded that, although Plaintiff could no longer perform her past work as a payroll clerk and data entry person[3], there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of industrial cleaner, auto detailer, and dishwasher. Tr. at 31. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

---

[3] Between 1988 and 2007, Plaintiff worked full time as an automated time reporter and payroll clerk at a phone company. At the hearings, Plaintiff indicated that she was included in a 2007 "downsizing" of the company due to her ongoing attendance problems. She characterized the layoff as a blessing because she was no longer capable of performing full-time work according to her testimony at the second hearing. Tr. at 48.

**IV.     STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

**V.     ANALYSIS**

Plaintiff advances a two separate but related arguments in this appeal. Plaintiff contends that the ALJ erred in assigning little weight to the opinions of two treating physicians, Scott Mabee, M.D. and Thomas Robb, D.O., and Plaintiff's counselor, Robert Waldsmith. In addition, Plaintiff argues that, as a result of giving little weight to opinions of Drs. Mabee and Robb and Mr. Waldsmith, the ALJ failed to meet his burden at Step Five. Plaintiff asserts that the ALJ should have included their respective conclusions that Plaintiff would be absent two or more days per month and would be off task at least twenty percent of the time in his hypothetical questions to the VE.

The earliest medical notes in the record relating to Plaintiff's psychiatric problems are dated December 11, 2001 to September 13, 2002. Plaintiff reported anxiety, depression, difficulty with coworkers, and frustration with a recent romantic relationship. Bharat J. Shah, M.D., diagnosed Plaintiff with Major Depressive Disorder, Recurrent, Severe with psychotic features and Bipolar disorder. Tr. at 288. Dr. Shah's notes reflect ongoing treatment, although the actual temporal parameters of the treatment appear to extend prior to Dr. Shah's first treatment notes. Dr. Shah prescribed Trazadone 150 mg., Remeron 30 mg., and Effexor XR 75 mg. and encouraged Plaintiff to continue supportive psychotherapy.

The next treatment notes, which are dated on April 24, 2007 (roughly two months after Plaintiff's alleged onset date), establish that Plaintiff was admitted to Saint Thomas Hospital on an emergency basis because she was depressed and contemplating suicide. Tr. 294, 346. The discharge summary indicates that Plaintiff had planned to take medications that would give her the courage to slit her wrists. Tr. at 346. Plaintiff was noted to have a long history of depression and she attributed her current relapse to the difficulties she had been experiencing with her mother as well as her teenage granddaughter. At the time of admission, Plaintiff was prescribed Effexor 300 mg., Trazadone 25 mg., Provigil 200 mg., and Clonazepam .5 mg. Because medication had not successfully treated Plaintiff's problems in the past, Dr. Masood Babai recommended electroconvulsive therapy ("ECT"). Tr. at 347. While in the hospital Plaintiff had a series of four ECT treatments. Initially, her condition fluctuated, but then gradually began to stabilize, revealing significant progress. She was discharged with instructions to consult a "Dr. Perrara" for continuing care, and was prescribed Effexor XR 150 mg and Trazadone 100 mg.

Plaintiff was seen at Kaiser Permanente on May 21, 2007, where she reported having "an extremely terrible time" following her ECT treatments and the modification of her medication. Tr. at 366-368. At a June 6, 2007 appointment, Plaintiff told Lisa Friese, LISW, that although her bouts with depression have lasted her entire adult life, she had kept them under control for the most part until recently. Tr. at 363. Plaintiff blamed her current problems on her financial stresses from being laid off from her job of eighteen years at a telephone company, a recent break up with a boyfriend, and the tumultuous relationships that she has with her family. Ms. Friese observed that Plaintiff was

bipolar and depressed, and assigned a Global Assessment of Functioning ("GAF") score of forty.[4] She recommended continuing treatment, with medications in addition to counseling, to stabilize Plaintiff's mood. Tr. at 365.

Plaintiff was again admitted on an emergency basis to Summa Health System on June 14, 2007, and was kept for evaluation for over a week. Tr. at 312-337. When she was first admitted, Plaintiff described her disposition as feeling hopeless, suicidal, and depressed as result of a horrible childhood. Tr. at 337. Following a psychiatric examination, Dr. Babai diagnosed Bipolar Disorder (Mixed) with Anxiety and Paranoia, a Personality Disorder NOS and assigned a GAF of thirty.[5] Tr. at 313. After several days of monitoring and medication, Plaintiff was able to regain a normal sleep schedule. Tr. at 334. However after a week, the medical notes characterize Plaintiff's appearance as disheveled and her hygiene as poor. Tr. at 328. Nonetheless, Plaintiff was released with medications the following day with instructions to continue visiting the after-care group therapy sessions. Tr. at 327.

Several days after being discharged, Plaintiff returned to Kaiser Permanente for a follow up for her mood disorder. Tr. at 359-360. She reported that, after her hospitalization, she had been less depressed and had no suicidal thoughts. Tr. at 359. She said her depression was at its highest in the mornings and gradually waned throughout the day. Tr. at 359. She was encouraged to see her psychiatrist the next week and instructed to continue with individual therapy sessions as needed. Tr. at 360.

In August of 2007, Plaintiff reported that she was still depressed and still experienced volatile mood swings, but that she was doing much better at managing her symptoms. Tr. at 357. Specifically, she was less worried about her finances and she had been avoiding her mother and male

---

[4]A GAF score of thirty one to forty indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoiding friends, neglecting family, unable to work).

[5]A GAF score of twenty-one to thirty indicates behavior influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., incoherence, acting grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends).

-6-

companionship, which historically had been her sources of angst. Tr. at 358. However, by October of 2007, Plaintiff had stopped bathing, eating well, sleeping at night, and had fleeting suicidal thoughts. Tr. at 354. Ms. Friese scheduled a follow up with individual therapy to stabilize Plaintiff's mood and improve her coping skills for moodiness. Tr. at 354. At the time, she indicated that she was unhappy with Dr. Perarra's help and was seeking a second opinion from Dr. Robb. Tr. at 352.

On November 16, 2007, Plaintiff had her initial consultation with Dr. Robb. Tr. at 388-391. She admitted to Dr. Robb that she had abused drugs and alcohol but indicated that she had been sober for fourteen years. Tr. at 390. Dr. Robb and Plaintiff reviewed her medications and he adjusted the medications she was taking as follows: Tegretol 200 mg. twice per day, Lamictal starter pack 25 mg. to increase every two weeks, Wellbutrin 75 mg SR, Effexor 150 mg. XR 2 tablets per day, Trazadone 50 mg., and Klonopin 5 mg.  Dr. Robb assigned a GAF score of sixty-five.[6] A follow-up visit was scheduled in three weeks. Tr. at 392. On December 15, 2007, Plaintiff complained of frequent nausea, fatigue, and reported that she had contemplated her own death. Tr. at 386.

In January of 2008, Plaintiff reported that she had less depression and regained some sleep regularity. Tr. at 385. Her weight had been stable and had no homicidal or suicidal thoughts. At every follow-up consultation between January and December of 2008, Dr. Robb assigned GAF scores of 65.  Tr. at 447-454. Plaintiff was performing volunteer work at an animal shelter and reported feeling well with no depression. Tr. at 382.

Despite reporting that she felt well enough to return to work in September of 2008, she was forced to resign from a position as a telephone sales representative after less than two weeks of employment. Tr. at 380. Specifically, Plaintiff reported that "she could not handle the job and the stress there and also had an automobile accident, and she has driven her daughter around."  Tr. at 380.  In December of 2008, Plaintiff reported that she was "not motivate to get a job," that she had been experiencing stomach and back pains, and issues in her personal life had been increasing her anxiety.  Tr. at 378-379.

---

[6]A GAF score of sixty-one to seventy indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social and occupational functioning, but generally functioning fairly well, with some meaningful interpersonal relationships.

Plaintiff was next seen for a medication management follow-up in March of 2009 and she reported that she had a lack of motivation to find a job although her mood and symptoms of depression were relatively stable. Tr. at 378. At her appointments with Dr. Robb on March 4, 2009, April 15, 2009 and July 8, 2009, Plaintiff complained of depression and lack of motivation. Dr. Robb continued to assign GAF scores of sixty-five. Tr. at 444-446.

In May of 2009, an agency psychiatric review technique was completed by Irma Johnston, Psy.D., which showed that medically determinable impairments were present, that is, bipolar disorder and borderline personality disorder, but they did not satisfy the diagnostic criteria, resulting in only mild restrictions of activities of daily living, and moderate restrictions in maintaining social functioning and concentration, persistence, and pace. Tr. at 405-418. Further, although Dr. Johnston recognized that Plaintiff had experienced episodes of decompensation, she concluded that they were insufficient in number to establish disability. According to a Mental Residual Functional Capacity Assessment that was completed by Dr. Johnston on the same day, Plaintiff experienced only mild to moderate limitations in all categories. Tr. at 419-422. Dr. Johnston concluded that Plaintiff's allegations were only partially credible based upon Dr. Robb's notes indicating that she was stable, but concluded that, based upon her history of mental illness, she was only capable of occupations requiring simple and routine work. Tr. at 421.

Dr. Robb completed a Medical Source Assessment on October 22, 2009. He observed that Plaintiff would either have noticeable difficulty or would not be able to understand or remember tasks and functions at work. Tr. at 425-426. He further opined that she would have noticeable difficulty understanding and remembering simple instructions and or would not be able to understand detailed instructions or maintain concentration for extended periods of time, although she would be capable of working in coordination with others and making simple work related decisions. On the other hand, Dr. Robb noted that Plaintiff would have little trouble with social interaction and adaptation. Tr. at 426. Dr. Robb further opined that Plaintiff would have noticeable difficulty setting realistic goals and making plans independently of others and accepting instruction and responding appropriately to criticism from supervisors.

In September of 2009, Plaintiff was seen by Dr. Mabee as a new patient at the Akron Clinic. Tr. at 526-529. Dr. Mabee diagnosed asthma and bi-polar depression disorder. In February of 2010, Dr. Mabee completed a form on which he concluded that Plaintiff could lift and carry only ten to twenty pounds, could stand and walk one to two hours a day and only twenty to thirty minutes without interruption; could sit a total of eight hours a day and for one to two hours without interruption. Dr. Mabee's assessment limited Plaintiff to only occasional climbing, balancing, stooping, crouching, crawling and kneeling. Tr. at 508-509. He further opined that Plaintiff should avoid heavy or excessive activities that could put stress on her spine. Dr. Mabee conceded that his assessment was predicated exclusively upon Plaintiff's subjective complaints, insofar as Plaintiff had not undergone any diagnostic testing for her back pain.

In January of 2010, Mel Zwissler, Ph.D., a second state agency physician, reviewed evidence in connection with Plaintiff's disability claim. Dr. Zwissler concluded that Dr. Robb's conclusions were without support from the medical record. Dr. Zwissler concurred with Dr. Johnston's conclusions regarding Plaintiff's RFC. Tr .at 505.

By May of 2010, Plaintiff's mental stability had again regressed to the point that she needed to be admitted to the inpatient psychiatric unit at Saint Thomas Hospital for a week because of homicidal ideation Tr. at 537, 694-696. Plaintiff had considered murdering her mother as a result of a critical comment made to her by her mother after Plaintiff had lost her job and her home. Despite her homicidal ideations, she denied any suicidal thoughts.

On June 30, 2010, Plaintiff met with Dr. Robb, and asked him to increase the dosage of Ritalin so that she would have more energy. She told him that if he did not give it to her she would acquire the drug elsewhere. Tr. at 532. In mid-July of 2010, Plaintiff sought emergency attention complaining that she did not want to live anymore. Tr. at 551. At her follow-up appointment in August of 2010, Plaintiff reported to her doctors that since moving into her mother's home their arguments leave her angry, sad, stressed, and anxious Tr. at 531. Plaintiff reported similar symptoms in her October 2010 consultation with no significant progress. Tr. at 530. In late December of 2010, she sought medical attention for pain in her stomach, headaches, and anxiety at work. Tr. at 557.

Dr. Robb completed a residual functional capacity assessment on August 26, 2010. Tr. at 561. Dr. Robb concluded that Plaintiff was markedly limited in her ability to work in cooperation with or proximity to others without being distracted by them. Dr. Robb concluded that Plaintiff was not significantly limited or only moderately limited in all of the remaining work-related categories. Specifically, he concluded that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, to maintain concentration, to perform activities within a schedule and be punctual, to sustain an ordinary routine without special supervision, to interact appropriately with the general public, to respond appropriately to criticism from supervisors and changes in the work place, and to get along with coworkers or peers without distracting them or exhibiting extreme behaviors. He ultimately concluded that Plaintiff was unemployable.

At her next consultation on January 27, 2011, Plaintiff told Dr. Robb that she has been angry and agitated and there has been no significant change in her depression. Tr. at 626. During a brief medication management follow-up on April 20, 2011, Dr. Robb characterized Plaintiff as being angrier. Plaintiff reported that she felt more tired despite having slept eight hours. Tr. at 624. Dr. Robb assigned a GAF score of fifty-eight.[7]

On May 6, 2011 and again on May 23, 2011, Plaintiff sought counseling and psychotherapy services at Portage Path Behavior Health ("PPBH") to discuss the sources of her anxiety and depression. Tr. at 632-635. Her therapist, Mr. Waldsmith recommended strategies for dealing with her dysfunctional family.

On June 1, 2011, Plaintiff went to the Emergency Department at one of the Summa Health System facilities. She was suicidal and had been hurting herself after yet another family argument. She was diagnosed as having a Depressive Disorder, NOS, r/o Major Depressive Disorder, recurrent, sever, r/o Bipolar Disorder, NOS, r/o Anxiety Disorder, NOS, and Nicotine Dependence on Axis

---

[7]A GAF score of fifty-one to sixty indicates moderate symptoms, that is, flat affect and circumlocutory speech, occasional panic attacks or moderate difficulty in social occupational, or school functioning that is, no friends, unable to keep a job, cannot work.

I and Borderline Personality Disorder on Axis II. Her GAF was 15[8] and she was admitted with Level 2 precautions. Tr. at 654-655.

On June 22, 2011, Mr. Waldsmith completed a mental residual functional capacity evaluation. He found that Plaintiff could not work in coordination with or proximity to others without being distracted by them; would be unable to maintain attention and concentration more than twenty percent of the day; would have difficulties eleven to twenty percent of the day responding appropriately to changes in the work setting, making simple work-related decisions, and understanding and remembering detailed instructions. Tr. at 698-699.

Also in June of 2011, Plaintiff underwent an MRI of the brain which revealed small nonspecific scattered subcortical and periventricular white matter seen bilaterally. While demyelinating etiology did not appear likely, it was not fully excluded. Tr. at 730. A lumbar puncture was undertaken to determine if Plaintiff had multiple sclerosis on July 12, 2011. Tr. at 800. No additional information was provided at either of the hearings regarding the results of this neurological testing.

On July 25, 2011, Dr. Robb wrote a one-sentence letter indicating that Plaintiff "is not able to work full time due to her increased anxiety in relationship to people and her depression." Tr. at 714. He also completed a mental residual functional capacity assessment that same day, wherein he concluded that Plaintiff would be off task for eleven percent or the day or more in every category with four exceptions: asking simple questions or requesting assistance; getting along with coworkers or peers without distracting them or exhibiting extreme behaviors; interacting appropriately with the public; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. Tr. at 715-716.

On February 16, 2011, following the first hearing of this matter, Dr. Herschel Goren responded to medical interrogatories propounded by the ALJ. Dr. Goren, a retired neurologist, opined that Plaintiff would have no greater than moderate limitation in any category assessed. Tr.

---

[8] A GAF score of eleven to twenty indicates some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene or gross impairment in communication (e.g., largely incoherent or mute).

at 599-600.  Plaintiff's counsel objected to Dr. Goren's testimony and requested a supplemental hearing so that she could cross examine him on the interrogatories he answered. Tr. at 270.

At the first hearing, Plaintiff testified that she works twenty hours a week making telephone calls for American Veterans ("Amvets").  When she started the job roughly a year before the first hearing, Plaintiff was working sixteen hours a week (four hours per day, Monday through Thursday) but due to an increase in business, Amvets had assigned an additional four hour shift to her on Fridays.  Plaintiff stated that her stress, agitation, and fatigue have increased due to the expansion of her hours. Tr. at 72, 83.  Plaintiff testified that she works in an office alone, Tr. at 48, and that being around other people is very stressful. Tr. at 72.  She explained that she is not impolite, but that she feels on edge around others. Tr. at 73.

Plaintiff explained that she "white knuckled it" through her full time work at the telephone company, as she has been struggling with depression for thirty years.  Although she did not have confrontations with co-workers, she described driving home from work "screaming in the car and thoughts of killing people at work and thoughts of killing [herself] in front of the people at work." Tr. at 76.

Although she described the "downsizing" of the telephone company where she worked for roughly nineteen years (1988-2007) as a "blessing" at the second hearing (because she intended to quit), she conceded at the first hearing that she fell into a severe depression after losing that job. *Id.* at 48, 76.  She had a few short-lived telephone service jobs at a call center and a medical services bureau after she was terminated from the phone company, but those jobs proved to be too stressful. She indicated at the first hearing that she intended to undergo testing for attention deficit disorder because she has a "problem with things seeming all jumbled." Tr. at 78.  Nonetheless, she conceded that her supervisors at Amvets are pleased with her work.

Plaintiff stated at the hearing that she suffers from GERD, muscle pain, and weekly headaches.  Tr. at 80.  She also has difficulty sleeping, but sleeping pills make her "too drugged." Tr. at 84.  Plaintiff described suffering from fatigue and nausea as a by-product of her prescription medication. Tr. at 80.  When asked if she has any difficulty grocery shopping, she did not describe

-12-

any physical problem, only the need to get in and out of the store quickly in order to avoid people. Tr. at 84-85.

When asked to explain why she can no longer work on a full time basis, Plaintiff responded, "I just can't take the stress anymore. For thirty years I have been taking medication and seeing therapists and psychiatrists and when I worked it was very difficult for me to work with people." Tr. at 48.

In her brief, Plaintiff contends that the ALJ erred in crediting the opinions of the agency physicians rather than the opinions of her treating physicians and therapist. The ALJ provided the following explanation for the weight given to the assessments of Dr. Mabee, Dr. Robb, and Mr. Waldsmith:

> [Dr. Mabee] opined that [Plaintiff] could perform work at the light level of exertion. Dr. Mabee stated that [Plaintiff's] subjective discomfort was the basis for such limitation. . . I give little weight to Dr. Mabee's opinion. While he treated [Plaintiff] he admitted that his opinion was based largely on [Plaintiff's] subjective allegations, rather than any substantive medical evidence. Moreover, the medical evidence as a whole, including treatment notes, does not indicate any such significant limitations. Indeed, [Plaintiff] had virtually no ongoing complaints or treatment regarding her alleged back impairment.
>
> Dr. Robb opined that [Plaintiff's] mental impairments would preclude her from carrying out detailed instructions and maintaining attention for extend [sic] periods. Dr. Robb concluded that [Plaintiff's] mental impairments would interfere with numerous work-related abilities for over 20% of the workday, including following simple instructions, maintaining a schedule, and accepting criticism from supervisors . . . .I give little weight to Dr. Robb's opinions. Dr. Robb's own treatment notes do not suggest any such substantial limitations, as he generally assigned [Plaintiff] GAF scores in the mild range.
>
> In June 2001,[Plaintiff's] counselor, [Mr. Waldsmith] opined that [Plaintiff's] mental impairments precluded her from working in coordination with others. Mr. Waldsmith further asserted that [Plaintiff's] impairments would impair several work-related abilities for over 20% of the day, including maintaining attention for extended periods and getting along with coworkers. Mr. Waldsmith concluded that [Plaintiff] would miss two days of work per month. I give little weight to Mr. Waldsmith's opinion. While he treated [Plaintiff], he is apparently not an acceptable medical source. Moreover, his opinion is not supported by the balance of the evidence. Mr. Waldsmith's own treatment notes suggest that while [Plaintiff] had difficult relationships with her family, she did not have significant difficulties getting along with others at her part-time position.

Tr. at 25-26, 29.

In turn, the ALJ gave great weight to the opinion of the agency physician and moderate weight to the opinion of the medical expert. The ALJ wrote:

-13-

> I give great weight to Dr. Johnston's opinion. She reviewed [Plaintiff's] records and based her assessment on the evidence therein. Moreover, Dr. Johnston's conclusions are generally consistent with the balance of the evidence. However, the records show that [Plaintiff's] episodes of decompensation were not for an extended period of time, as they lasted less than two weeks each.
>
> I give moderate weight to Dr. Goren's opinion. He reviewed the evidence of record and based his conclusions on the findings of [Plaintiff's] exams and treatment. Further, Dr. Goren's conclusions are generally supported by the evidence as a whole. however, the balance of the evidence suggests that [Plaintiff] has some additional mental limitations, as indicated by the residual functional capacity.

Tr. at 28-29.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell*

-14-

*v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Id.*  If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  *Id.* citing  20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion.   *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors."  The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion."  *Gayheart* at 377.  However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

Here, the ALJ did not err in giving little weight to the opinion of Dr. Mabee.  Dr. Mabee concluded that Plaintiff was not capable of medium work due to her back pain.  However, the degree of physical impairment due to Plaintiff's back pain diagnosed by Dr. Mabee is not supported by the record. Dr. Mabee treated Plaintiff from September of 2009 to March of 2010.  His medical records include prescriptions for sinus infections and gynecological test results.  There is no indication that Plaintiff's back pain was ever the subject of testing or treatment and objective findings in the record demonstrate that Plaintiff was neurologically intact and had a normal gait and station.  Tr. at 446, 557, 607, 624, 826.  Moreover, Dr. Mabee conceded in his residual functional capacity assessment

that his conclusions were based upon Plaintiff's "subjective symptoms only so far." Tr. at 509. Finally, when asked directly about her alleged inability to perform full time work at the hearing, Plaintiff cited psychological problems and never mentioned debilitating back pain. Accordingly, the ALJ did not err in giving Dr. Mabee's opinion little weight insofar as the nature and severity of Plaintiff's physical limitations are not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are not "inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

Turning to Plaintiff's mental limitations, Plaintiff contends that the ALJ failed to give appropriate weight to the opinion of Dr. Robb. Dr. Robb completed checkbox forms indicating some work-preclusive mental limitations and submitted a statement that Plaintiff could not work, however he provided no explanation for his opinion. In addition, Dr. Robb's treatment notes do not support his conclusions. Dr. Robb repeatedly assigned GAF scores of sixty-five, and at the lowest a GAF of fifty-seven, roughly a month and a half after Plaintiff was suicidal and engaging in self-injurious behavior after an altercation with her family. Tr. at 29, 378-87, 391, 442-43, 445, 530-32, 717-18. As the ALJ explained, these scores indicate that Plaintiff generally had, at most, only mild limitations. Tr. at 29. Likewise, Dr. Robb consistently reported that Plaintiff displayed clear and logical speech, no loose associations or delusions, no suicidal or homicidal ideation, good insight and judgment, logical cognition, average intelligence, and adequate or good memory and concentration . Tr. at 27-29, 378-87, 390-92, 439-46, 530-32, 557-58, 624-27, 717-18. The ALJ must afford controlling weight to the opinion of the treating physician only if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. Here, Dr. Robb's own treatment notes belie his dire conclusions regarding Plaintiff's ability to perform full-time work.

Moreover, Dr. Robb's conclusions regarding Plaintiff's mental limitations were inconsistent. For instance, in 2010, Dr. Robb concluded that Plaintiff was moderately limited in her ability to interact with the public and to get along with coworkers. Then in 2011, Dr. Robb concluded that

-16-

Plaintiff would have no observable limitations in her ability to get along with coworkers or peers without distracting them or exhibiting extreme behaviors, and would have noticeable difficulty interacting appropriately with the public no more than ten percent of the workday. Tr. at 715.

Here, the ALJ credited the opinion of the agency physicians that concluded that Dr. Robb's opinion regarding the degree of Plaintiff's limitations was contradicted by his treatment notes. The Commissioner views state agency physicians "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp.2d 813, 823–24 (S.D.Ohio 2011); §416.927(d),(f); SSR 96–6p, at *2-3.

As stated, "[o]pinions on [a claimant's residual functional capacity or whether a claimant is disabled] are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case . . ." 20 C.F.R. §§ 404.1527(d), 416.927(d) (emphasis added). Giving controlling weight to a treating physician's opinion about a claimant's work capacity "would be an abdication of the Commissioner's statutory responsibility." SSR 96-5p, 1996 WL 374183, at *2; see also 20 C.F.R. §§ 404.1527(d), 416.927(d). Rather, the ALJ considers all of the relevant evidence in assessing a claimant's work capacity. 20 C.F.R. §§ 404.1545(a), 416.945(a).

Finally, as to Mr. Waldsmith's opinion, the ALJ correctly explained that this opinion was by a therapist, a non-acceptable medical source and thus not a treating source entitled to controlling weight. See 20 C.F.R. §§ 404.1502, 404.1513(a), (d), 416.902, 416.913(a), (d) (explaining that therapists are not acceptable medical sources); §§ 404.1502, 416.902 (stating that a "treating source" must be an "acceptable medical source"); §§ 404.1527(c), 416.927(c) (explaining that only a treating source's opinion may be entitled to controlling weight).

Mr. Waldsmith indicated that Plaintiff had no limitation to extreme limitations in performing mental work-related tasks. Tr. at 697-99. The only explanation he provided was that Plaintiff had a history of poor work performance when having to work with others, which interfered with her focus and concentration Tr. at 699. As discussed above, the evidence does not support

-17-

work-preclusive mental limitations. In any event, the ALJ accounted for Plaintiff's difficulties working with others by finding that she could have only occasional, superficial interaction with co-workers and the public and that Plaintiff could perform unskilled work in which "concentration is not critical" Tr. at 24, 31, 60-63.

Finally, it is axiomatic that the hypothetical question posed to the VE must include the claimant's impairments because without an actual depiction of the limitations, the VE will not be able to accurately access whether jobs do exist that the claimant can perform with his or her impairments. *Schroeder v. Commissioner of Social Security*, 2012 WL 7657831, *18 (N.D.Ohio 2012) (citing *Lamtman v. Commissioner of Social Security*, 2012 WL 2921705, *14 (N.D.Ohio 2012)). The hypothetical question posed to a VE for purposes of determining whether a claimant can perform other work should be a complete assessment of the claimant's physical and mental state and should include an accurate portrayal of the claimant's physical and mental impairments. *Id.* ( citing *Farley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir.1987); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir.1975) (*per curiam*)). Generally, the hypothetical question should focus on the claimant's overall state. *Id.* It need not include lists of the claimant's medical conditions. *Id.* at 633. An ALJ is only required to incorporate into the hypothetical question, limitations that he or she accepts as credible. *Id.* (citing *Petro v. Astrue*, 2009 WL 773283, *4 (E.D.Ky.2009) (citing *Sias v. Secretary of Health and Human Services*, 861 F.2d 475, 480 (6th Cir .1988)). Here, having concluded that the ALJ did not err in giving little weight to the opinions of the treating physicians' opinions, the Court finds that no error occurred when the ALJ did not include the mental limitations ascribed to Plaintiff by Dr. Robb and Mr. Waldsmith in his hypothetical to the ALJ.

## **VI. CONCLUSION**

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: December 12, 2013

                                           */s/George J. Limbert*
                                           GEORGE J. LIMBERT
                                           UNITED STATES MAGISTRATE JUDGE